## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### DIVISION

| | | |
|---|---|---|
| **Katherine Smith** | : | |
| 4141 South Navajo Street, Unit A317 | : | |
| Englewood, Colorado 80110 | : | |
| | : | |
| Plaintiff, | : | Case No. 1:19-cv-2926 |
| | : | |
| v. | : | Judge |
| | : | |
| **Rite of Passage, Inc.** | : | Magistrate Judge |
| d/b/a Rite of Passage | : | |
| 2560 Business Parkway, Suite A | : | |
| Minden, Nevada 89423 | : | |
| ***Agent for Service of Process:*** | : | |
| Allison MacKenzie | : | |
| PO Box 646 | : | |
| Carson City, Nevada 89702 | : | |
| | : | |
| and | : | |
| | : | |
| **Matthew Martinez** | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT
### (Jury Demand Endorsed Hereon)

Plaintiff Katherine Smith ("Plaintiff"), by and through undersigned counsel, states the following as her Complaint for claims arising under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, the Minimum Wage Provision of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 206, the Overtime Provision of the FLSA, 29 U.S.C. § 207, Colorado's anti-discrimination law, C.R.S. 24-34-301, *et seq.*, as reenacted, and the Colorado Minimum Wage Act ("CMWA"), C.R.S. § 8-6-101, *et seq.*, as implemented by the Colorado Minimum Wage Order ("MWO"), 7 C.C.R. 1103-1, against Defendant Rite of Passage, Inc., d/b/a Rite of Passage ("Defendant Rite of Passage") and Matthew Martinez ("Defendant Martinez"):

1

## JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction over Counts I-IV pursuant to 28 U.S.C. § 1331 because the claims are set forth pursuant to the law of the United States of America.

2.    The Court has supplemental jurisdiction over Counts V-IX, Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367, because the claims arise out of the same set of operative facts.

3.    Venue is proper pursuant to 28 U.S.C. § 1391 as the events giving rise to the causes of action occurred in Jefferson County, Colorado, within the District of Colorado.

## PARTIES

4.    Plaintiff is a natural person residing in Denver County, Colorado. At all relevant times, Plaintiff was an employee of Defendant.

5.    At all relevant times hereto, Defendant Rite of Passage operated the Betty K. Marler Youth Services Center ("BKMYSC"), a youth prison. Defendant Rite of Passage is a Nevada corporation. At all relevant times, Defendant Rite of Passage employed at least fifteen (15) employees within the meaning of Title VII. Therefore, Defendant Rite of Passage meets the definition of "employer" set forth in 42 U.S.C. § 2000e(b).

6.    Defendant Martinez is a natural person. At times relevant hereto, Defendant Rite of Passage employed Defendant Martinez as the Principal of BKMYSC.

## FACTS COMMON TO ALL COUNTS

7.     During February 2017, Plaintiff interviewed for the Registrar position for BKMYSC. The interview with Defendant Martinez consisted of a facility tour, in-class observation, and a one-on-one interview in Defendant Martinez's office.

8.     During the interview, Defendant Martinez expressed interest in Plaintiff's personal life and asked on two separate occasions if she was in a relationship.

9.     Near the end of the interview, Defendant Martinez stated that Plaintiff's lips were "cracked" and that it was a good thing because it showed that she smiled a lot and that she had a "pretty smile."

10.     Defendant Martinez stated that he did not believe that Plaintiff was qualified for the position, but he believed that she would be a good fit for the facility.

11.     Defendant Martinez stated that Plaintiff was "really pretty" and that he would personally train her to ensure that Plaintiff could complete the job duties as needed.

12.     On Plaintiff's first day of employment, March 1, 2017, Defendant Martinez stated that he liked Plaintiff's choice of dress for work and that it was professional. Defendant Martinez explained that the former Registrar, Jessica Long, often wore revealing clothing and that it made for a "hard work environment," and Defendant Martinez laughed and winked. His demeanor was inappropriate and made Plaintiff uncomfortable.

13.     During April or May 2017, Group Living Staff Gabriella Lopez and English Teacher Krystle Smith turned in Defendant Martinez to Program Director Penny Sampson for having pornography on his laptop. Defendant Martinez had loaned his laptop to Krystle Smith so that she could show a presentation in her English class that day. When Krystle Smith opened the laptop, while in class with students, a pornographic video pulled up that

had been left open by Defendant Martinez. Krystle Smith and Gabriella Lopez both saw this. Krystle Smith immediately closed the laptop and returned it to Defendant Martinez following class. Gabriella Lopez reported this incident to Ms. Sampson who then questioned Krystle Smith. Krystle Smith confirmed that the incident happened. It was determined that the laptop Defendant Martinez loaned Krystle Smith was a personal laptop and not a facility laptop, which was against facility and company policy.

14.    When Plaintiff entered the office one day after the pornography incident, she asked Defendant Martinez if everything was okay because he looked upset. He stated that he had been turned in by a teacher for a "harmless incident." Becoming more upset, Defendant Martinez repeatedly stated that he believed that the teacher should have discussed the issue with him personally rather than humiliate him. He referred to the teacher as a "bitch" multiple times. Plaintiff became very uncomfortable as Defendant Martinez was extremely irate.

15.    Plaintiff excused herself from the office, stating that she had to tend to tasks elsewhere in the facility. Plaintiff stayed out of their office for the majority of the day and worked in the Administration office.

16.    That afternoon, before leaving for the day, Plaintiff complained about Defendant Martinez's episode to Ms. Sampson and Assistant Director Steven Terry. Plaintiff advised them that Defendant Martinez was very agitated and upset. Ms. Sampson stated that she was currently handling the situation with Defendant Martinez and that Plaintiff had nothing to worry about.

17.    In the weeks following the pornography incident, Defendant Martinez distanced himself from his job duties and those in his department and spent the majority of his time in Plaintiff and Defendant Martinez's joint office or offsite.

18.    Defendant Martinez stated to Plaintiff that he was currently looking for positions elsewhere and asked that Plaintiff proofread his cover letters and résumés. Feeling afraid and that she had no choice, Plaintiff complied on each occasion.

19.    Plaintiff informed Regional Director William Wood that she had done so.

20.    It was during this time that Defendant Martinez began giving Plaintiff more of his workload, expecting that she complete duties that she was not qualified to complete, such as GED testing and Teacher Evaluations.

21.    Defendant Martinez rationalized his neglect of duties as necessary for Plaintiff. He said he was planning to find a job elsewhere and Plaintiff would need to know how to complete those duties while the Defendant Rite of Passage looked for a new principal.

22.    Plaintiff questioned Defendant Martinez whether it was appropriate for her to complete GED testing since she was not a licensed proctor. Defendant Martinez assured Plaintiff that it was fine because he was credentialed. Defendant Martinez provided Plaintiff with his GED credentials and instructed her to proctor GED testing on multiple occasions.

23.    During May and June 2017, Defendant Martinez began asking Plaintiff to join him for drinks after work.

24.    When Plaintiff declined his advances, Defendant Martinez would insist that she join him for drinks, stating that money was not an issue because he would "cover" Plaintiff.

25.    Plaintiff always rejected Defendant Martinez's "offers" to have a drink because it was clearly inappropriate and he made her very uncomfortable.

26.     Initially, Defendant Martinez would keep insisting for a while and then would drop the subject.

27.     After a month or so of asking and Plaintiff's repeated declinations, Defendant Martinez became agitated and aggressive when Plaintiff declined. The work environment continued to deteriorate.

28.     After work one day in May or June 2017, Defendant Martinez asked Plaintiff to join him for drinks at Old Chicago.

29.     Defendant Martinez also instructed Plaintiff to call her boyfriend to let him know that Defendant Martinez would take her home.

30.     Plaintiff declined this "offer" numerous times and Defendant Martinez became visibly angry. Defendant Martinez walked in front of Plaintiff blocking her path so that she was unable to leave the office. Plaintiff was immediately very uncomfortable and intimidated.

31.     Plaintiff told Defendant Martinez that she could not join him for drinks because she had to babysit that evening. He then stated "okay" and the conversation ended.

32.     The morning after this incident, Defendant Martinez was again distant and agitated. Plaintiff could feel the tension, so she did not engage Defendant Martinez in conversation and, instead, began working on her tasks for the day.

33.     Later that morning, Plaintiff and four teachers in the Education Department were waiting for Defendant Martinez in the Technology Lab where the Education Department meetings were held each morning.

34.     Defendant Martinez was ten (10) minutes late to the meeting.

35.     As the staff waited, Science Teacher Lawrence Bjork asked if Plaintiff had any student achievement certificates that he could have.

36. Since Defendant Martinez had not joined the meeting yet, Plaintiff decided to grab the certificates from the office she shared with Defendant Martinez and to see if he would like to start the meeting without him.

37. As Plaintiff began to step out of the Technology Lab, Defendant Martinez entered. He was visibly irritated and physically pushed Plaintiff to the side as he entered the room.

38. Plaintiff tried to explain that she was just going to grab certificates for a teacher.

39. Defendant Martinez then raised his voice and yelled for Plaintiff to "sit down" and that he was "tired of *his* staff always being late," ignoring his own tardiness.

40. Math Teacher Kaleena Drake attempted to defend Plaintiff, but Defendant Martinez ignored her and started the morning meeting.

41. After the meeting, Social Studies Teacher Ryan Lerand spoke with Plaintiff about the incident. Mr. Lerand stated that he was upset that Defendant Martinez treated Plaintiff that way, especially in front of other staff.

42. Soon after this incident, Mr. Lerand resigned his position. Mr. Lerand informed Plaintiff that he advised Ms. Sampson about Defendant Martinez's continued aggressive and inappropriate conduct toward Plaintiff during his resignation meeting.

43. Incidents as the aforementioned became part of Plaintiff's daily work environment.

44. After engaging in aggressive and inappropriate conduct, Defendant Martinez would act remorseful. However, Defendant Martinez's aggressive and inappropriate conduct was cyclical and would start again.

45. On multiple occasions, Defendant Martinez offered Plaintiff money because, as he stated, she did not make a lot and he made "almost $80,000."

7

46. Defendant Martinez continually requested to buy Plaintiff lunch, dinner and drinks after work.

47. Defendant Martinez's advances were initially once a day. During the course of Plaintiff's employment, the advances increased daily, to five (5) to ten (10) times in a single day.

48. Plaintiff always declined Defendant Martinez's advances because they were unwelcome, inappropriate and offensive.

49. Defendant Martinez, however, was relentless and mean upon rejection.

50. Former Technology Teacher Jason Wagner, a close friend and office mate of Defendant Martinez, witnessed numerous retaliatory comments such as "Plaintiff is scared of me," or "Plaintiff thinks she's too good for me."

51. Attempting to diffuse the situation and maintain her employment, Plaintiff would reply that she was not scared of him, and that she did not think that she was too good.

52. On multiple occasions throughout May and July 2017, Defendant Martinez asked if Plaintiff would cheat on her boyfriend at the time.

53. Of course, Plaintiff denied that she would ever cheat on her boyfriend.

54. Defendant Martinez always replied that she would "for the right amount." Defendant Martinez would retaliate with comments that that Plaintiff was a "liar" and that "all women cheat if the other guy is hot or rich."

55. On several occasions, Defendant Martinez asked Plaintiff to stay late and complete tasks after work hours. Defendant Martinez also instructed Plaintiff to text her boyfriend and let him know that Defendant Martinez would take her home. Of course, Plaintiff declined.

56.  Defendant Martinez acted like his feelings were hurt and tried to make Plaintiff feel bad by making comments including, but not limited to, Plaintiff did not like him, Plaintiff thought he was "dirty," and Plaintiff's boyfriend did not like him.

57.  Defendant Martinez would ask Plaintiff to check his breath for him. Plaintiff responded with "That's weird" or "No, thanks."

58.  On other occasions, Defendant Martinez's pendulum would swing the opposite direction. During May to July 2017, Defendant Martinez also texted Plaintiff that she was "amazing," thanking her for "having his back" and thanking her for being her. Many of these texts were outside of work hours and late at night.

59.  On three separate occasions during May and June 2017, Defendant Martinez hugged Plaintiff without warning or permission. Each time he stated that he was not trying to be a "creep" and that he hoped that he had not "creeped [her] out."

60.  Defendant Martinez clearly knew that his conduct was unwelcome and inappropriate.

61.  Defendant Martinez was constantly trying to engage Plaintiff in inappropriate and sexual conversations.

62.  It appears Defendant Martinez thought that continued conduct would somehow seduce Plaintiff.

63.  On multiple occasions during May and June 2017, Defendant Martinez stated that he was physically attracted to Group Living Staff Danielle Alvaro. He stated that he loved to "look at her" and would "love to date her."

64.  Plaintiff once stated that Ms. Alvaro was in a relationship, and Defendant Martinez then repeated his statement that all women cheat "for the right amount."

65.   Defendant Martinez also repeatedly stated that he was physically attracted to Group Living Staff Kayleigh Lercara. He commented that she "has a nice ass." He once stated that he could never hang out with Ms. Lercara outside of work because he would "probably fuck her."

66.   Fed up with his constant trashmouth, Plaintiff finally responded and told Defendant Martinez that Ms. Lercara was in a relationship and he laughed and stated that "it doesn't matter because her boyfriend beats her." His ridiculous response made it clear that he was going to do and say whatever he wanted.

67.   During June 2017, Plaintiff informed both Ms. Alvaro and Ms. Lercara about Mr. Martinez's comments.

68.   Ms. Alvaro stated that Defendant Martinez had always made her feel "creeped out."

69.   Ms. Lercara stated that she knew something was "wrong with him" and that he previously asked her out.

70.   Ms. Alvaro also stated that Ms. Sampson received numerous complaints by multiple women in the facility about Defendant Martinez's inappropriate comments and conduct, but that nothing had ever been done about it. For example, Megan Bhatia, Therapeutic Manager, had spoken to Ms. Sampson about issues with Mr. Martinez. Ms. Bhatia complained that Defendant Martinez had been inappropriate with her by continuing to ask her on dates after she had told him to stop. She also complained that he continually questioned her ethnicity and religion.

71.   During June of 2017, Defendant Martinez stated to Plaintiff that he hoped that his record had been cleared because he had gone to jail for a month after a woman accused him of

punching her in the face at a bar. Plaintiff asked him if he was convicted, and he stated that he was not and that the woman had dropped the charges.

72.     During mid to late June 2017, Defendant Martinez told Jason Wagner and Plaintiff that he had "broken his penis" while having sex with a girl. He described their sexual encounter in detail, stating that she had "rode him too hard," while laughing, and then proceeded to explain how his penis was "broken." Defendant Martinez stated that he needed to leave work that day because blood was "running out of" his penis.

73.     Days after the broken penis story, Ms. Sampson approached Plaintiff, stating that she had been made aware that Defendant Martinez was sharing this story with female staff.

74.     Plaintiff confirmed that Defendant Martinez told her.

75.     Ms. Sampson stated that it was inappropriate and that she would confront him.

76.     Plaintiff complained to Ms. Sampson that Defendant Martinez made her uncomfortable for quite some time. He had continued to press her about going out for drinks, going on trips (Vegas and Moab), and that he texted her late at night. Ms. Sampson stated that she would talk to him about those issues.

77.     On July 5, 2017, Defendant Martinez texted Plaintiff before work stating that he was running late.

78.     Once Defendant Martinez arrived to work, he immediately sat down his backpack, lifted his shirt over his head and explained that he had been sunburnt while on vacation in Mexico.

79.     Plaintiff turned her head to work on her computer so she would not see his exposed chest.

80.     Later in the day, Defendant Martinez again lifted his shirt and stated that he had been sunburnt badly while on vacation. Plaintiff did not respond.

81.  Plaintiff had lunch at her desk that day because she had to prepare records for exiting students.

82.  While Plaintiff was eating lunch, Defendant Martinez entered the office with his lunch.

83.  After finishing his meal, Defendant Martinez turned his chair towards Plaintiff as she was sitting, facing the door, with him on her left, looking through files in the cabinet beside of her desk.

84.  Defendant Martinez stood up, lifted his shirt and stated that he "needed to eat better and get back into boxing."

85.  As his shirt was still lifted, Defendant Martinez continued to rub his stomach and asked what Plaintiff thought.

86.  Plaintiff stated that she felt uncomfortable and she stood up to leave the office.

87.  Defendant Martinez then stepped forward and blocked Plaintiff's exit from the office.

88.  With his arm outstretched against the door, Defendant Martinez positioned his body so that he cornered Plaintiff behind the door and against the wall.

89.  Defendant Martinez then began to undo his pants, and Plaintiff stated that she was uncomfortable and wanted to leave the office.

90.  Defendant Martinez then laughed at Plaintiff.

91.  Plaintiff closed her eyes because she was so scared.

92.  Plaintiff could feel and hear him pulling down his pants as Defendant Martinez leaned into her body.

93.  Plaintiff pressed herself as close to the wall as she could get in an attempt to avoid any contact with Defendant Martinez.

94.     Plaintiff then felt Defendant Martinez's penis pushed against the top of Plaintiff's thigh and then slide over onto her inner thigh. Defendant Martinez's penis was erect.

95.     Plaintiff could not tell if it was out of his underwear or not because her eyes were closed and she was terrified and in shock.

96.     Plaintiff used her forearms to push Defendant Martinez back towards his desk. He stumbled back into the desk but did not fall.

97.     Plaintiff immediately exited the office and went to the bathroom.

98.     Very upset and scared, Plaintiff spent the majority of the rest of the day outside of the office substitute teaching for Social Studies.

99.     Around 3:40 p.m. that day, Plaintiff waited in the SS Commons so that she could see when Defendant Martinez exited the office and she would have time to hide from him if he began walking in her direction.

100.    Soon after Plaintiff began waiting, Defendant Martinez exited their joint office and went to the front of the facility towards the Administration offices.

101.    Once Defendant Martinez was out of sight, Plaintiff rushed into the office where she gathered her belongings and immediately left the facility, although the workday was not over until 4:00 p.m.

102.    On the morning of July 7, 2017, Defendant Martinez began making phone calls to different friends and then someone who appeared to be an attorney. It was very obvious that Defendant Martinez was speaking loudly so that Plaintiff would hear him.  On those calls, Defendant Martinez stated that he wanted to press charges on his coworker for defamation. Defendant Martinez stated that he wanted his coworker to be punished to the fullest extent and needed to know what his options were.

103.   Following the end of his conversations, Defendant Martinez left the office for approximately thirty (30) minutes.

104.   When he returned, Defendant Martinez stated that Ms. Sampson had confronted him about the "broken penis" story.

105.   Defendant Martinez stated that he was offended because he had just received a call that day that he may have prostate cancer.

106.   Plaintiff acted oblivious about the complaint, knowing Defendant Martinez had told at least one other female staff, Krystal Smith, that story and that she reported the inappropriate conversation to Ms. Sampson.

107.   When Plaintiff acted oblivious to the complaint, Defendant Martinez apparently believed that Plaintiff had not turned him in and his demeanor changed to a less angry one.

108.   Defendant Martinez then asked if Plaintiff would like to go and get drinks. She again declined his offer.

109.   On July 7, 2017 Plaintiff complained to Clinical Director Julie Smith that she was experiencing issues with Defendant Martinez. Plaintiff stated that she feared for her safety. Julie Smith asked if Defendant Martinez had been inappropriate, to which Plaintiff responded affirmatively.

110.   Julie Smith then asked if she could inform Mr. Terry and Ms. Sampson of the situation. Plaintiff confirmed that it was alright for Julie Smith to do so.

111.   At that time, Julie Smith escorted Plaintiff to the Administrative Conference Room where she met with Julie Smith, Ms. Sampson, and Mr. Terry. In that meeting, Plaintiff complained that she was being continuously harassed and intimidated by Defendant Martinez and that he had sexually assaulted her on July 5, 2017. Plaintiff complained that

Defendant Martinez attempted to intimidate her when he spoke on the telephone about suing a coworker for defamation.

112.   Ms. Sampson stated that she had recently gone through training on Workplace Intimidation and that she believed that Defendant Martinez was attempting to intimidate Plaintiff. Ms. Sampson stated that she, personally, would handle the situation and contact the president of the company, Ski Broman. Ms. Sampson assured Plaintiff that the situation would be handled appropriately and immediately. Ms. Sampson then stated that Defendant Martinez would be terminated for his actions and reassured Plaintiff that she, personally, would take care of the situation with Ski Broman.

113.   Upon Plaintiff's arrival to work at 7:00 a.m. on July 10, 2017, she was informed by Group Living staff Michelle Miller that Ms. Sampson had called and asked that Plaintiff wait at Control until Ms. Sampson arrived.

114.   At approximately 8:00 a.m., Ms. Sampson arrived to the facility and asked that Plaintiff come to her office.

115.   Once Plaintiff arrived at Ms. Sampson's office, she was escorted inside and Ms. Sampson closed the door. Ms. Sampson stated that she was very sorry for what happened to Plaintiff and that as a woman it was not something that she should have to deal with. Ms. Sampson then stated that she had contacted Ski Broman about the incident, and that he was also very sorry for what had happened.

116.   Plaintiff stated to Ms. Sampson that she was sorry to cause a disruption by saying something, but that she did not know what else to do.

117.   Ms. Sampson stated that Plaintiff had nothing to be sorry for, and that Defendant Martinez had been placed on suspension that morning.

118.   Ms. Sampson stated that Defendant Martinez could not be officially terminated until Human Resources conducted an investigation, but Ms. Sampson assured Plaintiff that she had nothing to worry about.

119.   Ms. Sampson then advised Plaintiff not to report the sexual assault to Human Resources and to give only the information about the continued sexual harassment.

120.   After Plaintiff sat in stunned silence, Ms. Sampson stated that if Plaintiff were to report the sexual assault, it would cause major issues with Human Resources.

121.   Ms. Sampson stated that because Plaintiff did not have proof, it would be a "bad look" for her within the company.

122.   Ms. Sampson stated that Plaintiff had a promising career in Rite of Passage, and that if she was able to move forward from the situation, that she would not regret it.

123.   Ms. Sampson then stated that if Plaintiff did report the sexual assault, it would damage Plaintiff building a career there because it was a male dominant company, a "boys club."

124.   Although Plaintiff did not personally agree with Ms. Sampson's suggestion, Plaintiff agreed to only report the sexual harassment because she was very scared for her safety and her employment.

125.   Plaintiff had never experienced such inappropriate sexual harassment before and was naïve in following Ms. Sampson's instructions not to report the sexual assault to Human Resources.

126.   Ms. Sampson stated that Karen Doyle, Mountain Region's Human Resources Director, would be coming in that day to interview Plaintiff and other employees about the sexual harassment.

127.   Ms. Sampson then reiterated that Plaintiff should be cautious in regard to the information that she gave to Ms. Doyle and that she could trust that Defendant Martinez would be held accountable.

128.   Ms. Sampson further assured Plaintiff that she would no longer continue working with Defendant Martinez.

129.   Plaintiff told Ms. Sampson that she would tell Ms. Doyle about the sexual harassment and the excess workload. Plaintiff thanked Ms. Sampson for taking care of the situation and helping her.

130.   On July 7, 2017 and July 10, 2017, Ms. Sampson assured Plaintiff that she would no longer work with Defendant Martinez. Julie Smith and Mr. Terry were witnesses to Ms. Sampson's statement on July 7, 2017.

131.   At approximately 9:30 a.m. on the morning of July 10, 2017, Ms. Sampson entered the classroom where Plaintiff was substitute teaching and asked that she come to the administration area.

132.   Plaintiff followed Ms. Sampson to Julie Smith's office where Ms. Doyle and Regional Director William Wood were waiting for her.

133.   Ms. Sampson left the office and the interview began.

134.   Ms. Doyle explained that Mr. Wood was participating as a witness and asked if Plaintiff was okay with him being there.

135.   Plaintiff responded that it was alright for Mr. Wood to participate.

136.   Plaintiff then began detailing the harassment that she had experienced since starting employment at BKMYSC. Specifically, Plaintiff detailed the various incidents of harassment, up to the day that she was assaulted on July 5, 2017. When Plaintiff began

explaining what happened on July 5, 2017, she divulged the incidents leading up to the point that she was assaulted. Plaintiff explained everything to Ms. Doyle, including Defendant Martinez lifting his shirt multiple times to show his sunburn and him rubbing his hand across his stomach. Per Ms. Sampson's prior instructions, she did not provide the details of the sexual assault.

137.   Following the interview, Ms. Doyle asked that Plaintiff provide a written summary of what they had talked about and the information Plaintiff had given her and that Plaintiff needed to have it to her before she left that day.

138.   In the written statement regarding the incident on July 5, 2017, Plaintiff's statement ended at "He rubbed his stomach as he kept his shirt lifted and stated that he 'needed to eat better and get back into boxing.' And then asked me what I thought. I just laughed and walked out of the office." At no time did Plaintiff consent to Defendant Martinez lifting his shirt nor did she consent to Defendant Martinez cornering her behind the office door and pushing his erect penis onto her inner thigh.

139.   Although Plaintiff felt uncomfortable leaving out information about Defendant Martinez's July 5, 2017 sexual assault when speaking with Ms. Doyle and Mr. Wood, Plaintiff followed Ms. Sampson's instructions not to talk about the actual sexual assault.

140.   Ms. Doyle asked what Plaintiff wanted from the investigation, and she stated that she did not want to continue working with Defendant Martinez, especially in the same office, and that if it was concluded that she would have to do so, that she would probably resign from her position.

141.   That day, following her interview with Ms. Doyle and Mr. Wood, Plaintiff received a letter from Ms. Doyle stating that the investigation was ongoing and that she did not have an

exact date as to when the investigation would be completed. Ms. Doyle stated that the Company would protect her from any retaliation that she may experience as a result of coming forward with her allegations and cooperating with the investigation. Ms. Doyle also reiterated that Plaintiff could not retaliate against anyone. Ms. Doyle stated that if conduct inconsistent with Company policy is determined to have occurred, swift corrective action would be taken. Ms. Doyle indicated that Plaintiff would be notified when the investigation was concluded. Plaintiff signed and acknowledged her receipt and understanding of that letter.

142.    On July 13, 2017, Ms. Sampson asked Plaintiff to come to her office. Ms. Sampson stated that the investigation had been concluded and that Plaintiff's allegations were found to be unfounded. Ms. Sampson informed Plaintiff that because she did not have proof of her allegations, the Company could not take action.

143.    Ms. Sampson then presented Plaintiff with a letter from Human Resources that stated "Portions of the facts presented are too inconclusive to substantiate your allegations."

144.    Ms. Sampson assured Plaintiff that she would protect her and that she hoped that Plaintiff would not resign because Plaintiff had a "bright future" in the Company.

145.    Ms. Sampson then stated that if Plaintiff stayed and continued her work, Ms. Sampson promised that Plaintiff would be promoted and no longer have to work with Defendant Martinez.

146.    Plaintiff asked Ms. Sampson what would happen in regard to sharing an office with Defendant Martinez. Ms. Sampson stated that he would be moved to another office.

147.   Plaintiff asked Ms. Sampson if she would have to continue working under Defendant Martinez. Ms. Sampson stated that she and Human Resources had decided that Ms. Sampson would be Plaintiff's direct supervisor. Plaintiff would report to Ms. Sampson.

148.   Ms. Sampson also stated that she would be performing Plaintiff's employee performance reviews to ensure that Defendant Martinez was not biased in regard to her merit based pay raise.

149.   Because Ms. Sampson promised that Plaintiff would not have to work under Defendant Martinez and that she would eventually be promoted to a position that was outside of Defendant Martinez's purview, Plaintiff agreed to sign the conclusion letter.

150.   Ms. Sampson then stated that Defendant Martinez would be counseled and would receive disciplinary action, however, she could not state what that would be.

151.   Ms. Sampson then stated that she believed that Ms. Doyle had made the wrong decision in Plaintiff's case and that Ms. Doyle was known to mismanage, but for Plaintiff not to be discouraged.

152.   Ms. Sampson stated that if Plaintiff had additional issues, she needed to come to her personally and she would ensure that Plaintiff would be taken care of.

153.   Ms. Sampson indicated that Plaintiff could talk to her whenever she needed to talk and that she wanted Plaintiff to feel safe.

154.   Because of Ms. Sampson's representations about Ms. Doyle and Human Resources, Plaintiff trusted Ms. Sampson's word and believed Ms. Sampson would keep her safe.

155.   Following the investigation, Defendant Martinez was removed from the office and placed in another office in the building.

156.   Defendant Martinez continued to act as Plaintiff's direct supervisor, despite the directive Plaintiff received from Ms. Sampson on July 13, 2017.

157.   Plaintiff was also was assigned and expected to continue GED testing with Defendant Martinez off-site without any supervision.

158.   After the investigation, Defendant Martinez harassed Plaintiff on a daily basis. Defendant Martinez not only retaliated against Plaintiff in private, but he had begun to do so in front of staff and students.

159.   Plaintiff reported incidents of Defendant Martinez's retaliation to Ms. Sampson on October 24, 2017, October 30, 2017, December 13, 2017 and December 15, 2017. Ms. Sampson advised Plaintiff to speak to her directly, not Human Resources, about any incidents of harassment and/or retaliation by Defendant Martinez.

160.   Plaintiff assumed additional duties of Defendant Martinez after Plaintiff's complaint. Plaintiff attended weekly Clinical meetings in place of Defendant Martinez. Therapists Turqoyz Roghan, Nancy Taylor, Adam Wojtezko, and Nurse Ashley Uney attended those meetings and the notes with proof of Plaintiff's regular attendance were logged with Rite of Passage. Plaintiff also attended students' monthly staffings in place of Defendant Martinez. Those monthly meetings were held with client managers/parole officers and those notes with Plaintiff's attendance were logged with the students' therapists and client managers/parole officers. At the student staffings, Plaintiff provided the students' updated schedules, updated transcripts, updated grade reports and in-school behavioral reports. Plaintiff completed monthly Per Pupil Revenue reports, Key Performance Indicator reports, teacher evaluations, in-class observations, in addition to compiling all necessary information for the 2017 Advanced Accreditation monitoring.

161.   Ms. Sampson promised Plaintiff a promotion if she performed the duties of Instructional Team Lead position.

162.   On September 5, 2017, Plaintiff submitted her letter of resignation:

> I, Katherine Smith, am giving formal notice that I will be leaving my position as Registrar at Betty K. Marler 30 days from today's date of September 5, 2017 due to an uncomfortable and hostile work environment caused by my direct supervisor, a workload that does not reflect the amount I am paid, and lack of support from Human Resources in regard to prior complaints made (i.e. Lack of accommodations made after initial harassment claim.) Under the guidelines of the *Equal Employment Opportunity Commission*, *Title VII of the Civil Rights Act of 1964*, and the *Equal Pay Act of 1963*, I am eligible to file claims of Harassment, Sexual Harassment, Un-Equal Pay and Retaliation against Rite of Passage due to the fact that all claims are made against my direct supervisor, legally viewed as my "Employer." I do not feel that Rite of Passage has taken the necessary steps in order to provide a positive work environment, not only for myself, but for other staff as well, and most importantly, it is not providing the type of environment necessary for our students to heal and thrive.

163.   Plaintiff rescinded her September 5, 2017 resignation after a conversation with Ms. Sampson in the days following Plaintiff turning it in. Ms. Sampson stated that Plaintiff was making a bad decision by resigning for those reasons and that she would suffer backlash from the Company if she proceeded. Ms. Sampson stated that a thorough investigation had been conducted, and that without proof Plaintiff did not have a case.

164.   Fearful of being terminated before her resignation date of 30 days following September 5, 2017, and unprepared to be unemployed, Plaintiff rescinded the resignation.

165.   Plaintiff submitted a second resignation letter on February 23, 2018.

166.   At the time Plaintiff presented the February 23, 2018 resignation letter, Human Resources had not done its job in protecting her. At the time, Plaintiff was not aware that Ms. Sampson purposefully failed to inform Human Resources of the multiple incidents of harassment and retaliation that had occurred since the July 2017 investigation.

167.   On February 28, 2018, Ms. Doyle and Plaintiff had a meeting to discuss the reasons for Plaintiff's letter of resignation. Ms. Doyle informed Plaintiff that she did not know about Defendant Martinez's continued harassment and/or retaliation. Ms. Doyle questioned Plaintiff why she did not tell Human Resources directly. Plaintiff informed Ms. Doyle that Ms. Sampson instructed Plaintiff to go through Ms. Sampson because Ms. Doyle mismanaged Plaintiff's original complaint.

168.   Plaintiff also discussed with Ms. Doyle how she was completing most of Defendant Martinez's job duties.

169.   Ms. Doyle asked Plaintiff to rescind her resignation, which Plaintiff did later that day.

170.   Defendant Martinez was placed on administrative leave on February 28, 2018.

171.   On March 7, 2018, Plaintiff received an email from Ms. Doyle with a letter attached that was completely at odds with Plaintiff and Ms. Doyle's February 28, 2018 meeting. Ms. Doyle asserted that Plaintiff had not completed the duties Plaintiff completed, that Plaintiff did not have the expertise to complete such duties, that the duties Plaintiff completed fell under her job description, and that the recension of Plaintiff's resignation had not been approved by the Corporate Human Resources Manager or the Executive Regional Director. Ms. Doyle closed by stating that Rite of Passage was continuing to investigate Plaintiff's claims and that Plaintiff would be contacted as soon as possible regarding the investigation.

172.   After reading the March 7, 2018, Plaintiff printed it and provided it to Executive Regional Director Kent Moe and Regional Director Mr. Wood to read. Kent Moe stated that Plaintiff should have never received the letter from Ms. Doyle and that it was "preemptive." He stated that Plaintiff needed to ignore the letter and that she needed to be proud of the graduation that she had put together. Plaintiff told Mr. Moe that she was not going to

continue to allow Human Resources to bully her and that she was not going to allow a man (Defendant Martinez) to just get away with preying upon her like Rite of Passage had allowed him to do. Mr. Moe stated that he was going to meet with Defendant Martinez the following day and that if Plaintiff would give him just one day, Plaintiff would be "satisfied." Mr. Moe then stated that Plaintiff would continue employment at BKMYSC as long as Plaintiff wanted. Plaintiff told Mr. Moe that she would not respond to the letter until he had spoken with Defendant Martinez on the following day. Plaintiff advised Mr. Moe that if things were not cleared up and Defendant Martinez was not held accountable, Plaintiff would proceed with charges.

173.   On March 8, 2018, Plaintiff received an investigation conclusion letter from Ms. Doyle stating, "The facts are too inconclusive to substantiate your allegations." The body of the email stated, "Mr. Wood and Ms. Madden have accepted the withdrawal of your resignation."

174.   Plaintiff sent an eight page response letter to Ms. Doyle's March 7, 2018 letter and the March 8, 2018 investigation conclusion letter. Plaintiff went point by point referencing Ms. Doyle's March 7, 2018 letter and the inaccuracies in that email when referencing their conversation during the February 28, 2018 meeting. Plaintiff expressed concern that the investigation conclusion letter was dated for March 7, 2018 when that was the date that Ms. Doyle stated the investigation was ongoing. Plaintiff asked Ms. Doyle why there was a date discrepancy and if she could give an answer as to why there was a date discrepancy. Plaintiff stated that she would not sign the conclusion letter because she did not agree with it and because of the issues with the date of the letter.

175.   Ms. Doyle never responded to Plaintiff's email.

176.    Plaintiff was later informed by Ms. Madden that Ms. Doyle had received backlash from Rick Wright for meeting with Plaintiff on February 28, 2018.  According to Ms. Madden, Mr. Wright required Ms. Doyle to write the March 7, 2018 letter.

177.    On March 12, 2018 Plaintiff applied for the position of Instructional Team Lead. Ms. Madden had stated that the position was being posted.

178.    On March 16, 2018, Ms. Madden returned Plaintiff's internal application and stated that the job had not been posted yet.

179.    On March 22, 2018, Ms. Madden sent an email stating that the Company had decided to not hire for the position. Mr. Molineux would perform functional supervision and Ms. Madden would perform direct supervision. There was no plan for who would complete Defendant Martinez's job duties, which fell on Plaintiff without additional compensation until the hire of Sydney Johnston in June 2018. Defendant Martinez expected Plaintiff to take on the additional work.

180.    In Plaintiff's meeting with Ms. Doyle and Kim Todd on August 1, 2018, Ms. Doyle stated that she too believed that they had cleared the air on February 28, 2018 and that she was sorry for the email. Ms. Doyle also stated on August 1, 2018 that many of the issues regarding Plaintiff were often handled without her and, because of that, she believed that it had caused many of the issues Plaintiff was having with the Company.  Ms. Doyle further stated that it was bad business practice on their part.

181.    On April 4, 2017, Plaintiff emailed Ms. Doyle asking when she would receive her annual evaluation. Ms. Doyle responded that she believed it had been drafted, but not completely reviewed. Ms. Doyle advised that she would contact Mr. Wood and Ms. Madden to confirm. Ms. Doyle stated that Plaintiff's merit based raise would be retroactive to March

1, 2018 when the evaluation was due. The Company policy states that evaluations must be performed within 30 days of the annual evaluation date.

182. On April 26, 2018, Ms. Madden conducted Plaintiff's annual evaluation. During the meeting, Ms. Madden stated that Defendant Martinez had conducted an evaluation as well but that she did not agree with many of the marks he had given Plaintiff. Ms. Madden presented Defendant Martinez's evaluation to Plaintiff and allowed her to review it. Ms. Madden assured Plaintiff that she would do what she could to get Plaintiff as high of a raise as possible. Ms. Madden stated that she believed Plaintiff deserved a six percent (6%) raise, the top raise an employee can receive. Ms. Madden, however, stated that Plaintiff only worked with her for a short period of time so Ms. Madden "had to reference Mr. Martinez's evaluation." Based on his evaluation, Ms. Madden could not give Plaintiff the six percent (6%) raise so Plaintiff was penalized for Defendant Martinez's retaliation. Ms. Madden stated that she was going to add a comment from Division of Youth Services Site Monitor Diane Skufca. Diane Skufca emailed Ms. Madden in regard to the Instructional Team Lead position. The email from Diane Skufca that was added to the evaluation stated:

> I wanted to follow up with my thoughts about the principal position that we talked about the other day. Her name is Katie Smith, currently she is the registrar, but way overqualified! She is truly amazing and could do wonders for the school program! I don't know if you have any say, but I think that she would be great at least as the Head Teacher position that you were talking about. Just my 2 cents?

The email from Diane Skufca was a forwarded email from Client Manager Sue Cleary. The evaluation was completed and signed by Plaintiff. Ms. Madden then emailed the evaluation to Ms. Doyle, Kim Todd and Plaintiff. Ms. Madden stated that Plaintiff had been granted a 4 percent merit based raise, backdated to March 1, 2018.

183.    Upon arriving to work on April 27, 2018, Nikki Harbison informed Plaintiff that Ms. Madden wanted to meet with Plaintiff in her office. At that time, Ms. Madden opened her office door and asked Plaintiff to come in. When Plaintiff entered her office, it was apparent that Ms. Madden very upset because she was crying. Ms. Madden then stated that Corporate had denied Plaintiff's evaluation that had been completed the previous day, and that it would have to be resubmitted. Plaintiff asked Ms. Madden why the previous evaluation was denied, and Ms. Madden stated that she had gotten in trouble for putting Diane Skufca's email in the comment section. Plaintiff asked Ms. Madden why the comment was not allowed, and she stated that she believed it had caused issues because of the recommendation that Plaintiff be promoted. Plaintiff signed the new annual evaluation that did not have the email from Diane Skufca because she needed to receive her pay raise as soon as possible as a result of the recent increase in Plaintiff's student loan payments.

184.    Later that morning, Ms. Madden sent Plaintiff an email with Ms. Doyle, Mr. Wood and Corporate Director of Human Resources Rick Wright copied. The email stated, "Plaintiff, please be advised that the copy of the evaluation you received on 4/26/2018 is invalid per HR and will need to be revised. I do sincerely apologize for my error in presenting this to you without following the proper protocol." After receiving Ms. Madden's email, Plaintiff filed an Employee Grievance. On the grievance form, in the section Description of the Issue, Plaintiff stated "H.R. did not conduct a complete and fair investigation into claims made in Feb. 2018. H.R. failed to provide an employee evaluation in a timely manner and out of compliance with Company policy. H.R. has caused a loss of wages in time from 3-1-18 to Present due to failing to complete employee evaluation that pay raise is dependent upon." In the section Have You Discussed the Issue with Your Immediate Supervisor,

Plaintiff checked "Yes." <u>Name of Supervisor You Spoke with</u>: "Ms. Madden." Plaintiff attached a letter to Human Resources to the Grievance form.

185.   In the letter, Plaintiff stated that Human Resources: (1) failed to conduct a complete and fair investigation in both July 2017 and February 2018; (2) failed to interview all witnesses that she had provided; (3) failed to use the information of those they had interviewed; (4) failed to answer her questions following the conclusion of the February 2018 investigation; (5) was out of compliance with Company policy requiring her evaluation within 30 days of March 1, 2018; and (6) excluded a supervisor statement regarding referral for promotion a lack of company policy to the contrary. Further, Plaintiff stated that she had been performing the duties of the Principal since Defendant Martinez's departure without compensation, and that she had maintained compliance in the department since his departure. Plaintiff stated that although Human Resources had stated that she does not have the expertise to evaluate and perform Defendant Martinez's job duties, Human Resources had not made an effort to fill his position following his resignation so Plaintiff was required to perform those additional duties. Plaintiff stated that Human Resources either did not feel that it was necessary to adequately staff the Education Department and provide adequate services, or Human Resources was under the impression that Plaintiff was capable of performing the necessary duties to keep the department in compliance. In regard to the assertion that Plaintiff stated that she was entitled to Defendant Martinez's salary, her statement was that Defendant Martinez was paid a salary of $62,400 for his job duties as Principal and that there was an obvious disparity between Plaintiff's wage and Defendant Martinez's salary.

186.  Plaintiff stated in her internal application for the Instructional Team Lead position that she had been completing the duties of the position for months and the completion of those duties had been confirmed by Ms. Madden. Additionally, Plaintiff applied to the ASPIRE program for administrative licensure offered at University of Colorado, Denver. Plaintiff presented this application to Mr. Wood, Mr. Terry and Jennifer West. Plaintiff advised Mr. Wood that she would need Rite of Passage to sign off in order for her to be accepted into the program.  Mr. Wood stated that he would talk to Ms. Doyle and assured Ms. Smith that it would be signed off. Mr. Wood met with Plaintiff in the following weeks and stated that the Company had decided to hire someone with a Masters in Special Education because the Company wanted to terminate Mr. Molineux's contract. Based on this, Mr. Wood represented that the new hire must have a Masters in Special Education per the Company contract with the State. Based on Mr. Wood's representation, Plaintiff relinquished the opportunity because she would not be able to complete her Masters Degree in time. Mr. Molineux's contract had not been terminated as of July 17, 2018.

187.  On July 20, 2018, while on an impromptu staff retreat following the closure of BKMYSC, Plaintiff had two (2) missed calls from a Nevada number (775-267-9411) at 1:03 p.m. Plaintiff called the number at 1:19 p.m. and was directed to the front desk. The number was to Rite of Passage's corporate office. Plaintiff stated to the receptionist that she had two (2) missed calls from that number and that she was returning the call. The receptionist stated that she was not aware of who had contacted her. Plaintiff told the receptionist that she would check her email to see if whoever was trying to contact her had reached out that way, and the conversation ended.

188.   Plaintiff then checked her email, and she had an unread email from Mr. Wright. In that email, Mr. Wright stated that he called Plaintiff a couple of times but was unable to reach her. He stated that he was unable to leave her a voicemail because her message center was full. Mr. Wright stated that Plaintiff needed to contact him at her earliest convenience because it was a time sensitive matter. He provided his office and personal phone numbers.

189.   Plaintiff then called Mr. Wright on his personal cell phone at 1:24 p.m. When Mr. Wright answered the phone, Plaintiff introduced herself. He then asked Plaintiff to hold for one moment because he needed to step outside for better cell service. Once he was outside, he began the conversation. He stated "Plaintiff, I have your EEOC charges on my desk. I don't know if you know this, but this is a lot of work. It is a lot of work on us, but it is a lot of work on you. So, I am going to offer you a favor. As you know, we don't know what is going to happen to Betty K. Marler employees, and I don't know that you will have a job. So today, I am going to offer you $10,000, you resign, we admit no fault and you drop all charges." Plaintiff responded, "Mr. Wright, I appreciate your offer but I am going to have to say 'no' at this time." After a long pause, Mr. Wright responded, "Can I ask why?" Plaintiff stated, "I have been going through this with you guys for over a year, and I have been through a lot, and I cannot take that offer, but I appreciate your kindness." Mr. Wright responded, "Well, you are making a mistake because I am pretty sure that we are going to win." Plaintiff stated, "That is okay. Again, thank you." Mr. Wright then abruptly ended the phone call. At that time, Plaintiff was standing with Charles Allen and Mr. Terry. Because Plaintiff had Mr. Wright on speakerphone, Mr. Allen and Mr. Terry heard the conversation.

190.    During a meeting on August 1, 2018 regarding a Coach Counselor position at Ridge View Academy, Plaintiff informed Ms. Doyle and Kim Todd that Mr. Wright called to offer Plaintiff $10,000 for her to resign and drop all charges. Ms. Doyle, visibly shocked, stated that she was not aware that Plaintiff had been made that offer. She then stated that she believed that Mr. Wright had made that offer to Plaintiff because she and Ms. Sampson provided differing statements when asked to respond to the EEOC charges. Ms. Doyle stated that she and Ms. Sampson gave differing responses in regard to the follow-up of the July 2017 investigation. She stated that Ms. Sampson had lied and that, luckily, she had kept all of the documentation and could show that Ms. Sampson had been untruthful. Plaintiff told Ms. Doyle and Ms. Todd that she was concerned that the intimate relationship between Ms. Sampson and Mr. Moe would affect her employment and that she did not feel safe continuing to work there. Ms. Doyle stated that she too had concerns regarding that relationship and that she had voiced her concerns when she learned about their relationship. Ms. Doyle stated that because Ms. Sampson and Mr. Moe were in positions higher than hers, she was unable to do anything about it. She then apologized for the chaotic relationship between Human Resources and Plaintiff, but that she hoped that Plaintiff understood that Ms. Sampson was the root of the problem. Plaintiff responded that she felt hurt by Ms. Sampson and that it made her very sad to realize that her career and reputation were now tarnished just because she had gone to Ms. Sampson for help in July 2017. Ms. Doyle stated that she was sorry, but assured Plaintiff that she thought highly of her and that she had no hard feelings towards her. Ms. Doyle stated that she would have to call Mr. Wright to inform him of their conversation.  She intended to ask him about the $10,000 offer. Plaintiff told her it was okay and that Plaintiff was willing to talk to Mr. Wright about

mediation, but that she would not settle for less than she believed that she deserved. Plaintiff told Ms. Doyle that she was not seeking money like the Company seemed to believe. Plaintiff said that what she truly wanted was for someone to admit fault and to admit that she had been wronged. Ms. Doyle stated that she understood. Following that meeting, Plaintiff received an email from Mr. Wright stating that he had spoken with Ms. Doyle and she had informed him that Plaintiff would be interested in mediating. He stated that he would be on vacation the following week, but that Plaintiff could contact him via email or call him on his personal cell phone. Plaintiff responded that she would need to seek legal advice before making a decision. Following obtaining legal counsel, Plaintiff ceased all communication in regard to the charges.

191. Plaintiff dual filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Colorado Civil Rights Division ("CCRD") on June 7, 2018, Charge No. 32A-2018-00529, FE2018026693.

192. Plaintiff received a Right to Sue Letter dated July 19, 2019, attached hereto as Exhibit 1.

193. On July 16, 2018, BKMYSC was taken over by the State of Colorado. State officials entered the campus and escorted all employees off the campus.

194. BKMYSC employees were told by Kent Moe to meet at Hotel Lakewood across the street from the facility. Once the staff gathered at the hotel, Mr. Moe explained that the State had taken over the facility and that the employees were not allowed back until further notice. Mr. Moe ordered the employees to meet at Ridge View Academy the following day and that he would have more information at that time. After the meeting, the employees, except Mr. Moe, went to a local bar.

195.    While at the bar, Jennifer West informed Plaintiff that she had a conversation earlier that day with Ms. Sampson, who called Plaintiff a "bold faced liar" and a "manipulator." Ms. Sampson stated that Plaintiff could not be trusted.

196.    On July 17, 2018, Plaintiff received an email from a BKMYSC youth asking if staff were okay and wanting to know what would happen with her job prospect. Plaintiff had been working on the youth's job transition and college transition with the consent of the youth's parents, therapist Jennifer West, Assistant Direct Steven Terry and Interim Program Director William Wood.

197.    Plaintiff responded that she, along with the other staff, was okay and that Plaintiff would continue working on her job transition.

198.    Plaintiff assumed that there would be no issues with her communication with the student based on Mr. Moe's statements the previous day.

199.    Later that day, the BKMYSC staff met at Ridge View Academy and was informed that the contract with the State had been revoked, but there was a possibility that education and treatment services would be continued. It was only certain that Direct Care staff would not return.

200.    A staff member then asked about communications with the youth. Mr. Moe stated that it was alright to speak with the students, but Ms. Sampson interjected and stated that staff was not allowed to speak with the youth. Mr. Moe then responded that it is often inevitable to have contact with the youth, and that if they reached out or if staff saw them while out, it was alright to speak with them.

201.    Following the facility wide meeting, Mr. Moe asked that Education and Therapeutic staff join him to talk. During that conversation, Mr. Moe stated that Defendant Rite of Passage

was working on a contract so that education and treatment could continue at BKMYSC and that he would have the finalized information by that evening.

202.   While standing with the Education Department, Plaintiff asked Mr. Moe what she was supposed to do in regard to students' records because she had been receiving emails requesting their records and that she needed advice on what to do about the youth's college and job transition.

203.   Mr. Moe stated that it was in the best interest of the students that Plaintiff continue working on their records and transition.

204.   Plaintiff then asked Mr. Moe if she could step to the side because she needed to speak with him privately.

205.   Once Plaintiff and Mr. Moe separated from the group, Plaintiff stated to Mr. Moe that she did not appreciate Ms. Sampson contacting her witnesses for her Charge of Discrimination and telling them that she was a liar, a manipulator and that Plaintiff was not to be trusted.

206.   Mr. Moe stated that he was not aware that had happened and asked which staff Ms. Sampson had approached.

207.   Plaintiff stated that she thought it best that she not tell him which staff it was, but that he should be aware that Plaintiff had been informed.

208.   Mr. Moe stated that he was sorry and that he would have to turn in the incident to Ms. Doyle.

209.   Plaintiff affirmed that it was alright for him to inform Ms. Doyle, but to know that Plaintiff did not appreciate Ms. Sampson speaking ill of her because Plaintiff had made a conscious effort to keep her issues with Defendant Rite of Passage out of her day-to-day work environment.

210. Plaintiff was then approached by Ms. Doyle, who hugged Plaintiff and stated, "Everything is going to be okay."

211. Plaintiff informed Ms. Doyle that she was having issues with Ms. Sampson. Specifically, Plaintiff informed Ms. Doyle that Ms. Sampson approached witnesses stating that Plaintiff was a liar, a manipulator and that Plaintiff could not be trusted.

212. Ms. Doyle stated that Plaintiff knew how Ms. Doyle felt about Ms. Sampson.

213. Plaintiff stated to Ms. Doyle that she did not appreciate Ms. Sampson speaking ill of Plaintiff when Plaintiff had made an effort to keep those issues out of work.

214. Ms. Doyle stated that she understood and that she knew that Plaintiff knew that Ms. Sampson often said things that were untrue.

215. On July 20, 2018, while on an impromptu staff retreat with BKMYSC staff, Plaintiff received a call from the youth who she had been working with on the youth's job transition. A staff member was with the youth.

216. The youth said that she and the staff member were working on getting the information needed to proceed with the transition.

217. During the conversation, it was determined that Plaintiff was missing a telephone number that she would need in order to get the rest of the information needed for the youth.

218. The youth stated that she had the telephone number in her email and that she would email it to Plaintiff.

219. While on the telephone with the youth, while she was still being supervised, the youth emailed Plaintiff the telephone number.

220. Plaintiff informed the youth that she would contact the necessary people and relay the information to her as she received it.

221.   Later that day, Plaintiff retrieved the email from the youth with the telephone number of the youth's potential job placement.

222.   Plaintiff left a voicemail for the youth's potential job placement.

223.   Plaintiff then emailed the youth, stating that the call had gone to voicemail and that Plaintiff would try again in an hour. Plaintiff stated that if she did not receive an answer, she would call again on Monday. Plaintiff signed off the email with "Proud of you! Keep grinding."

224.   Later that day, Plaintiff received a department-wide email from Instructional Team Lead Sydney Johnson. The email was a forwarded email from Mr. Moe stating that the education and treatment services were officially returning to BKMYSC and that staff would be returning to work the following week.

225.   On July 23, 2018, the youth that Plaintiff had been helping with the job transition emailed to remind Plaintiff to contact the potential job placement.

226.   Plaintiff responded that she would call every hour on the hour until she had answers. Plaintiff told the youth to have a "splendid day."

227.   Plaintiff emailed the youth at 11:49 a.m. stating that she had attempted to contact the potential job placement site but did not get an answer and she would try again after lunch.

228.   Plaintiff emailed the youth at 12:46 p.m. and stated that she had attempted to call again, but able to leave a voicemail. Plaintiff informed the youth that Plaintiff would let her know when she reached someone. That was Plaintiff's last contact with the youth.

229.   On July 24, 2018, Plaintiff returned to work at BKMYSC.

230.   That morning, Plaintiff was contacted by Mount View YSC's Principal, Kim Ledden. Ms. Ledden stated that she had been working with the youth that Plaintiff had been working with on college and job transition. She stated that her site would work with the youth again

the next day, because the BKMYSC staff was still working to prepare the building for the students' return, and she would give us the youth's progress.

231. The afternoon of July 24, 2018, Plaintiff was contacted by Michael Winston, Mount View YSC's Next Step Teacher. Mr. Winston informed Plaintiff that he had been working with the youth on her college courses and that Plaintiff should be advised that the youth is not permitted to have unmonitored use of a computer. Mr. Winston stated that the youth still had work that would need to be completed that week.

232. On July 26, 2018, while driving back to work during Plaintiff's lunch break, Plaintiff received a telephone call from Jennifer West. Ms. West stated that she had just been notified that Plaintiff was going to be fired. Plaintiff asked why she was going to be fired, and Ms. West stated that because Plaintiff had contact with the youth about the youth's job placement. Plaintiff informed Ms. West that her contacts with the youth were supervised by Mount View YSC staff and that the conversations were in regard to the youth's transition. Ms. West stated that she knew that information, but she had no say in the matter and she wanted to give Plaintiff notice before she returned to the facility.

233. When Plaintiff returned to the BKMYSC facility, she was unable to locate Ms. West or Sydney Johnston.

234. Visibly emotional and upset, Plaintiff sat in the empty math classroom.

235. Michelle Miller, Mental Health Aid, stepped in and asked if Plaintiff was alright. Plaintiff explained the situation. Ms. Miller stated that she did not think that was fair because she had contact with students after the State takeover and that she was aware of several other staff that had contact with students during that time.

236. After Ms. Miller left, Ms. West entered the room to check on Plaintiff. Plaintiff showed Ms. West her emails with the youth, and Ms. West stated that she did not see anything inappropriate in the emails. Ms. West then stated, "You know why this is happening and you know who brought this on. You cannot blame yourself and you cannot let them bring you down. You have to keep fighting."

237. Shortly after Ms. West left, Val Last Name Unknown ("LNU"), Interim Program Director, entered the room and asked that Plaintiff meet with her. Plaintiff followed Val LNU to Plaintiff's office, where Sydney Johnston was waiting.

238. Val LNU informed Plaintiff that she was going to be escorted off site because she had contacted a youth. Val LNU stated that if Plaintiff had any questions, she should contact Mr. Moe.

239. Plaintiff stated that she understood that she could not be onsite, but she felt that she should be able to defend herself. Plaintiff then explained to Val LNU the situation and what conversations had transpired with the youth. Plaintiff asked that Val LNU find out what staff member the youth was with on July 20, 2018 when Plaintiff was contacted by the youth.

240. Val LNU stated that she would try to find that out, but that she had limited information and was only there to deliver it.  Val LNU further stated that Plaintiff would need to give all of the information to Mr. Moe because Val LNU had been ordered to direct further conversations to him.

241. Val LNU helped Plaintiff pack up her office, and Val LNU took Plaintiff's keys. Val LNU and Ms. Johnston escorted Plaintiff to the gatehouse and Plaintiff exited the facility grounds.

242.   Plaintiff contacted Mr. Moe, who explained that Plaintiff had been placed on "paid leave" because she had contacted a student and that Plaintiff was prohibited from being on the facility's grounds.

243.   Plaintiff explained to Mr. Moe the conversations she had with the youth and explained that she was informed that the student was supervised by staff during those interactions. Plaintiff then reminded Mr. Moe that he had given Plaintiff permission to work on the youth's transition.

244.   Mr. Moe stated that he remembered having that conversation with Plaintiff. Mr. Moe stated that until the investigation was closed, that Plaintiff was not permitted to return to work. Mr. Moe informed Plaintiff that she would be paid during the investigation.

245.   Plaintiff asked Mr. Moe if she could forward him the emails that she had exchanged with the youth and the call log from the July 20, 2018 conversation.

246.   Mr. Moe stated that Plaintiff could email that information to him and that he and Mr. Wright would be overseeing the investigation. Mr. Moe reiterated that Plaintiff would be paid during the investigation, and that he would be in contact once it was concluded.

247.   Plaintiff emailed Mr. Moe that email conversations with the youth and the phone logs.

248.   A couple of hours after Plaintiff sent the email to Mr. Moe, she attempted to check her email to see if he had responded. When Plaintiff attempted to do so, she received notice that she no longer had access to her Rite of Passage email account.

249.   Plaintiff emailed Mr. Wright from her personal email, stating that she was unable to access her Rite of Passage email and that she was reaching out via her personal email. Plaintiff stated that she had been informed that she had been put on paid leave due to an investigation and that Mr. Wright and Mr. Moe would be overseeing the investigation. Plaintiff stated

that she had emailed the correspondence with the youth to Mr. Moe, in addition to the phone logs. Plaintiff explained why the youth and she had been in contact and stated that Plaintiff had been informed that the youth was being supervised by Mount View YSC staff while in contact with Plaintiff. Plaintiff stated that she had spoken with Mr. Moe on July 17, 2018 in regard to Plaintiff's concerns about the youth's transition and students' records and that Mr. Moe had approved Plaintiff to continue working on those things. Plaintiff stated Kim Ledden and Michael Winston had also been in contact with her in regard to the youth's progress and that the student was being supervised when accessing a computer. Plaintiff stated that she was absolutely willing to cooperate on all matters.

250.   Mr. Wright responded and stated that at that time Plaintiff was on investigative suspension. Mr. Wright stated that he and Mr. Moe had to work with the State to investigate and make a determination and that he would present the evidence Plaintiff had provided to the State authorities. Mr. Wright stated that if Plaintiff was cleared of wrongdoing, that she would receive normal wages for each day lost at no fault of her own. Mr. Wright stated that if it was determined that Plaintiff had violated State policy, he and Mr. Moe would have to decide on the appropriate course of action. Chief Operating Officer Lawrence Howell, Ms. Karen Doyle and Mr. Moe were copied on the email.

251.   Ms. Doyle responded and stated "Kent, please note: [Rite of Passage] policy does not pay employees while on investigative suspension. Please confirm with Ms. Smith." Ms. Doyle stated that if Plaintiff was returned to duty with no fault from the investigation, she would be reimbursed for time that should have been paid. Ms. Doyle stated, "This means yesterday (July 27th) would be the last day of pay at this time."

252.    That night, Plaintiff informed Mental Health Aid Sarah Healy about what was going on. Ms. Healy stated that she too had emailed the same the youth. Ms. Healy stated that she was concerned that she would be in trouble too, but that she had not been notified. Upon information and belief, Ms. Healy was never confronted about her contact with the youth.

253.    On July 31, 2018, Ms. Doyle contacted Plaintiff at 9:46 a.m. from her office phone. Ms. Doyle stated that Plaintiff was no longer on investigative suspension, however she was not allowed to return to BKMYSC per the State's request. Ms. Doyle stated that Plaintiff could work at Ridge View Academy as a Coach Counselor on B Shift and that Plaintiff would be paid $12 per hour. Ms. Doyle stated that there were no other positions available for which Plaintiff was qualified. Plaintiff asked Ms. Doyle why she was not allowed back to BMKYSC if the investigation was closed.  Ms. Doyle stated that it was per the State's request and that there was nothing that Rite of Passage could do about it. Plaintiff asked her if she could have time to decide on what Plaintiff wanted to do moving forward.   Ms. Doyle stated that Plaintiff could but that Plaintiff would have to let her know by the following morning and that if Plaintiff did not, it would be assumed that Plaintiff was declining the position.

254.    At 10:00 a.m., Plaintiff contacted Ms. Doyle to inform her that Plaintiff would take the position as Coach Counselor. Ms. Doyle stated that Plaintiff would be paid $12 per hour and that Plaintiff needed to report to Ridge View Academy the following day at 1:30 p.m. for Shift Change. Ms. Doyle stated that Plaintiff would need to complete the appropriate paperwork and that Plaintiff would need to fill out a new pay form. Plaintiff stated that she would be there at 1:30 p.m. Ms. Doyle stated that Plaintiff needed to be prepared to work. Plaintiff stated that she would be.

255.    At 10:20 a.m., Plaintiff again called Ms. Doyle to ask if she would receive back pay for the days missed. Ms. Doyle stated that Plaintiff would receive her pay. Plaintiff asked if the pay would be at her Registrar rate of $16 per hour and Ms. Doyle stated that it would, but that starting the following day Plaintiff's pay would be $12 per hour. Plaintiff again asked Ms. Doyle why she would not be allowed at BKMYSC if the investigation was over.  Ms. Doyle stated in an agitated tone that she could not permit Plaintiff to go back and that the contract with the State was very thin so Rite of Passage had to abide by what they said. Plaintiff stated that she understood and she was only wondering. Plaintiff then stated that she would see Ms. Doyle the next day at 1:30 p.m.

256.    Following the conversation, Plaintiff attempted to check her Rite of Passage email, but she still did not have access to it.

257.    At 11:00 a.m., Plaintiff emailed Ms. Doyle and Mr. Wright, and copied Mr. Moe and Lawrence Howell. Plaintiff stated, "Mr. Wright and Ms. Doyle, As I am no longer on investigative suspension and it has been determined that there has been no finding in my case, when can I expect to have access to my ROP employee accounts?"

258.    At 11:04 a.m., Ms. Doyle responded, "Ms. Smith, we need to officially move you to RV and then restore all access."

259.    At 11:14 a.m., Plaintiff contacted Colorado Department of Human Services ("CDHS") in an attempt to get more information about her case. When Plaintiff contacted CDHS, she was informed that they were not aware of an investigation. They stated that if Plaintiff was under investigation, it was through Rite of Passage and that they did not have any information on that process. Plaintiff asked if they were aware that she was not permitted to be on Mount View YSC grounds, and they were not aware of that. Plaintiff asked her

where she would be able to get that information, and she stated that she should contact Mount View YSC.

260.   Following that conversation, Plaintiff contacted Mount View YSC and asked to be connected to Val LNU, the Interim Program Director at BKMYSC. Plaintiff was directed to Nikki Harbison. Plaintiff asked Ms. Harbison if she could speak with Val LNU in regard to the investigation, and she stated that Val LNU was currently offsite but that she would inform her that Plaintiff had reached out and have her return Plaintiff's call. Plaintiff never received a call back.

261.   At 12:36 p.m., Ms. Doyle emailed Plaintiff, stating, "Ms. Smith – I did not inform you that you have been removed from investigative suspension. DYS has removed your access to the facility in your position as Registrar. I did inform you that we have not determined a finding against you at this time. While we complete the investigation, you are being offered a position at Ridge View YSC as a CC. The outcome of our investigation will determine your employment status continuing at BM and/or RV. I have already requested you to meet with us at RV on Wednesday about 1:30p to discuss the situation. Please confirm."

262.   At 1:38 p.m., Plaintiff responded to Ms. Doyle's email:

> Ms. Doyle, thank you for clarifying, however after reviewing our phone conversations from today at 9:46, 10:00 and 10:20, it seems that different information has been relayed from those conversations to your most recent email, and the information that I have received from State officials. I find it best that we work out those differentiations in person tomorrow so that there is no further confusion. Again, thanks for getting in touch and the opportunity to continue employment at Ridge View. I will see you tomorrow at 1:30.

263.   At 1:54 p.m., Mr. Wright emailed Plaintiff, stating that if Plaintiff had information from State officials to make sure that she brought it to Ms. Doyle as it may speed up their investigation. He then stated:

I want to make it very clear at this time, the email communication below from Ms. Doyle at 12:38 is correct. There appears to be confusion on the status of our investigation. You are on investigative suspension and based on the results of that investigation, a determination will be made as it relates to your employment at BMYSC and/or RVA… If you have any additional information, please provide it to Ms. Doyle so that we can conclude the investigation and if your [sic] cleared, hopefully get you back to work.

264.   Plaintiff and Ms. Doyle had a meeting at Ridge View Academy on August 1, 2018. Ms. Doyle stated that Plaintiff's dress was not work appropriate for the job. Plaintiff stated she was under the impression, referencing Mr. Wright's July 31, 2018 1:54 p.m. email, that she was not permitted to work. Ms. Doyle stated that Plaintiff was not permitted to work at BKMYSC, but that Plaintiff could work at Ridge View. Plaintiff apologized and told Ms. Doyle that she was confused because she had been receiving different information. Ms. Doyle stated that it was alright, and that they would only meet that day.

265.   Plaintiff asked to record the conversation, but Ms. Doyle stated that she would not meet with Plaintiff if she recorded the conversation. Ms. Doyle stated that she would have Kim Todd sit in and that she could be a witness. Plaintiff felt that the meeting with Ms. Doyle was important, so she agreed to not record the conversation and rely on Ms. Todd as witness. Ms. Doyle then stepped out of the office and asked Ms. Todd to come in. Once Ms. Todd entered the office, the meeting began.

266.   Plaintiff stated to Ms. Doyle that she had concerns in regard to the investigation and that she had several questions that she wanted to ask. Ms. Doyle stated that the investigation had been concluded and that although there had been no finding to warrant Plaintiff being terminated, she would be counseled. Ms. Doyle stated that Sydney Johnston would provide the counseling, but that it would be at a later date when Ms. Johnston was able to come to

Ridge View. Plaintiff asked Ms. Doyle what she needed to be counseled on, and Ms. Doyle replied that she would let Ms. Johnston go over that with Plaintiff.

267. Ms. Doyle stated that it had been requested that Plaintiff be fired, Ms. Doyle did not specify by whom, but that she did not believe Plaintiff should be fired.

268. Ms. Doyle stated that the takeover of BKMYSC was sudden and that she felt that many staff were fearful of losing their relationships with the students and that she understood why staff had been in contact with students. Ms. Doyle then stated that two other employees had been banned from the facility, but she did not specify why.

269. Plaintiff asked Karen Doyle why her email access had been revoked because she was aware of other employees that had been placed on investigative suspension and that they still had email access. Ms. Doyle stated that she was not the one who revoked Plaintiff's access and that she could not answer that question because she did not have that information, but that it was typically protocol to revoke access during an investigation. Plaintiff told Ms. Doyle that she understood that protocol and agreed to it, but that Plaintiff's concern was that she had been singled out when others still had access and had never lost their access.

270. Plaintiff then asked Ms. Doyle if Mr. Moe and Ms. Wright oversaw her investigation, and she stated yes.

271. Plaintiff then asked Ms. Doyle why she had copied Ms. Sampson on the emails from the previous day. Ms. Doyle stated that Ms. Sampson had just been named as the Program Director that day, July 31, 2018.

272. Plaintiff asked Ms. Doyle if she thought it was fair that Mr. Moe was overseeing Plaintiff's investigation or that Ms. Sampson was privy to the emails when she and Mr. Moe were in an intimate relationship. Plaintiff currently filed charges against Ms. Sampson. Plaintiff

45

stated that she did not believe that an unbiased investigation could be conducted because of Mr. Moe's relationship with Ms. Sampson. Ms. Doyle stated that she understood Plaintiff's concerns and Ms. Todd concurred. Ms. Doyle then stated that she herself had issues with Mr. Moe as her boss being in a relationship with Ms. Sampson, but that she had no power over that. She stated that she had voiced her concerns before, but that Plaintiff needed to understand that Ms. Sampson and Mr. Moe were in higher positions than she. She said that she would voice Plaintiff's concerns to Mr. Wright.

273.    Plaintiff then stated to Ms. Doyle that she felt as if she had been retaliated against because she filed a charge of discrimination.  Also, on July 20, 2018, Mr. Wright had contacted Plaintiff and offered her $10,000 for her to resign, the Company to admit no fault and for Plaintiff to drop all charges, and then six (6) days later, Plaintiff was placed on investigative suspension. Ms. Doyle then looked very shocked and looked at Ms. Todd who looked shocked as well.  Ms. Doyle stated that she was not aware that Plaintiff had been made that offer, and that she understood why Plaintiff would feel as if she had been retaliated against because after hearing that information, she would feel the same way. Ms. Todd agreed that she too, if in Plaintiff's position, would believe that she was being retaliated against. Ms. Doyle said that she was sorry that she was not aware of that.

274.    Plaintiff then expressed her concern that Ms. Sampson was now the Program Director only days after Plaintiff had been suspended. Ms. Doyle stated that she understood Plaintiff's concerns. Ms. Doyle stated that she was very sorry for how things had gone over the last year, but that she wanted Plaintiff to know that she respected her and that she had no hard feelings towards Plaintiff. Ms. Doyle stated that she hoped that Plaintiff knew that Plaintiff's issues stemmed from Ms. Sampson making statements and promises that she

could not follow up on. Plaintiff responded that she was very hurt and exhausted from the last year. Plaintiff stated that she never intended for things to end up the way that they had and that all she ever wanted was for someone to help her. Plaintiff then began to cry. Ms. Doyle stated again that she wanted Plaintiff to know that she did not approve of the relationship between Ms. Moe and Ms. Sampson and that she had tried to talk to Mr. Moe about it, but that no one listened to her. Ms. Doyle stated that she was sorry that Human Resources had not been able to help Plaintiff and that had she been made aware, that she would have done her job appropriately. Ms. Doyle stated that because Kent Moe and Rick Wright often did things without her knowledge, it made it seem as if her department had bad business practice. Plaintiff told Ms. Doyle that she understood and believed her when she said that she was not aware of many things, but that the situation had gotten out of control and that Plaintiff no longer felt safe working for Rite of Passage. Ms. Doyle stated that she did not want Plaintiff to feel that way, and that if Plaintiff took the job at Ridge View Academy, she would ensure that Plaintiff was safe. Ms. Doyle stated that if Plaintiff did take the job, that Plaintiff should be aware that Mr. Moe would still be the Executive Regional Director of Plaintiff's site and that Ms. Sampson would still be on site at times as well because she has an office there. Plaintiff stated that she did not feel comfortable with that, but that Plaintiff loved working with the kids and that she wanted to try out the Coach Counselor position. Ms. Todd stated that she appreciated Plaintiff's passion and that it was amazing to see that Plaintiff still wanted to continue employment with the Company and that Plaintiff was dedicated to their mission.

275.   Plaintiff then asked if there were any BKMYSC staff working at Ridge View Academy and Ms. Doyle stated that several were. Plaintiff asked about several different staff and

then asked if Group Living Staff Cortlin Couture had decided to stay with the Company. Ms. Doyle stated that she was currently working on getting Cortlin Couture in a great position there.

276. Ms. Doyle stated that she had been directed to contact Mr. Wright following their meeting and that she was going to confront him about the $10,000 offer. She then stated that she believed that Mr. Wright made the offer because she and Ms. Sampson had given differing stories on how the July 2017 investigation follow-up was handled. Ms. Doyle stated that Ms. Sampson did not give truthful information, but that she had kept documentation to show what directives she had given Ms. Sampson. Ms. Doyle then stated that Plaintiff did not need to worry about Ms. Sampson because she had "bigger fish to fry" and that the fish was her.

277. Plaintiff told Ms. Doyle that she had issues with Ms. Sampson approaching Plaintiff's witnesses and stating that Plaintiff was a "liar" and "untrustworthy." Plaintiff then stated that she had been notified that Ms. Sampson had been at BKMYSC on July 27, 2018 asking employees who were informed about the investigation. Plaintiff did not see any reason for Ms. Sampson to do that as the investigation had nothing to do with her. Ms. Doyle stated that she understood Plaintiff's concerns and that she would provide Plaintiff with an Employee Grievance form.

278. Plaintiff then stated that she also had concerns that multiple BKMYSC staff had been informed that she had filed charges against the Company. Ms. Doyle stated that it was human nature to talk about things, but that she understood Plaintiff's concerns.

279. Ms. Doyle then asked if Plaintiff would be open to mediation. Plaintiff stated to Ms. Doyle that she would be open to a realistic mediation, but that Plaintiff would not settle for less

than she believed she deserved and that she did not agree with Mr. Wright's initial offer. Plaintiff explained to Ms. Doyle that her life had been severely impacted over the last year, and that she was not going to be bullied. Ms. Doyle stated that she understood and that she would inform Mr. Wright.

280.    Plaintiff and Ms. Doyle ended the conversation on a light note. Ms. Doyle hugged Plaintiff before she left and told Plaintiff to go home and get some rest. Ms. Doyle reiterated that she respected Plaintiff and that Plaintiff needed to do whatever was necessary to protect herself. Ms. Doyle gave Plaintiff her personal cell phone number and stated that she could contact her if Plaintiff needed anything, even if it was to just talk. Plaintiff thanked her for meeting with Plaintiff. She asked that Plaintiff report to Ridge View Academy the following day to begin work and that Plaintiff would fill out the pay forms then.

281.    Following the meeting, Ms. Doyle emailed Plaintiff's personal email with Mr. Wright copied. Ms. Doyle stated that Plaintiff had stated that she wanted to file a grievance on Ms. Sampson and that the documents to do so were attached. Ms. Doyle also asked that Plaintiff give her the names of the State employees who Plaintiff had spoken with who stated that it had appeared that Plaintiff had been blackballed.

282.    Mr. Wright responded to the email and stated that Ms. Doyle had informed him that Plaintiff was interested in mediation. Mr. Wright stated that he was happy to discuss with Plaintiff and explore what she was looking for in mediation. Mr. Wright stated that they could maybe arrange a phone call and go from there.

283.    Plaintiff responded to Ms. Doyle's email and thanked her for sending the forms since she forgot them when she left the facility. Plaintiff asked Ms. Doyle if it was necessary that she mention Rite of Passage employees' names because those witnesses had asked that Plaintiff

not give their names in fear of retaliation. Plaintiff stated that she had been advised to not release the names of the State employees due to Ms. Sampson's personal relationships with employees CDHS/DYS. Plaintiff stated that she had noted Ms. Doyle's willingness to investigate and resolve the matter. Plaintiff stated that once she received clarifications in regard to filing the grievance, she would send along the necessary information.

284.   Plaintiff responded to Mr. Wright that she was happy to hear of the possibility of a mediation but that she needed to be advised first.

285.   On August 2, 2018, Plaintiff went to Ridge View Academy and informed Ms. Todd that she decided to not take the position as Coach Counselor because she could not continue working in the hostile environment as it had taken a toll on Plaintiff's physical and mental health. In addition, the position paid $4.00 less an hour.  Ms. Todd stated that she understood and that she believed Plaintiff was making the right decision.

286.   At that time, Ms. Doyle arrived to work and stepped in to Ms. Todd's office. Ms. Todd informed Ms. Doyle that Plaintiff declined the position. Ms. Doyle asked Plaintiff why, and Plaintiff stated that she could not continue working in the hostile environment.

287.   Plaintiff then asked if declining the position would have a negative impact on her employment reference. Ms. Doyle and Ms. Todd both stated that it would not. Ms. Doyle stated that if contacted for reference, she would state that Plaintiff was eligible for rehire and left on good terms.

288.   Plaintiff signed the resignation paperwork and turned it in to Ms. Todd.

289.   Ms. Todd again stated that she thought Plaintiff was making the right decision and that Plaintiff needed to do what was best for her and take care of herself. Ms. Todd gave Plaintiff her business card and told her to contact her if Plaintiff needed anything.

290.   Before leaving, Plaintiff stopped by Ms. Doyle's office and thanked her for the opportunity and for her time of employment. Ms. Doyle told Plaintiff to call her if Plaintiff needed anything.

291.   Because Plaintiff completed eighty percent (80%) of Defendant Martinez's job duties in addition to her duties as Registrar, as well as substitute teaching, and/or because Defendant Rite of Passage did not replace Defendant Martinez for three months after his resignation on March 8, 2018, Plaintiff worked more than forty (40) hours per week each week that she worked at BKMYSC. Plaintiff was never paid for any time that she worked off the clock or for overtime for the hours that she worked over forty (40) hours per week.

292.   During April 2017, while at Ridgeview Academy for training, Plaintiff discussed with another staff member from another facility about working on student schedules and transcripts from home because there was still a lot of paperwork to catch up o from before Plaintiff took the Registrar's position in March 2017.

293.   Defendant Martinez was adamant that Plaintiff bring the student schedules and transcripts up-to-date before an audit.

294.   Jamie Glick, Ridgeview's Clinical Director, overheard Plaintiff's conversation and interjected that Plaintiff did not have to complete the work from home and that it was against protocol to work off the clock.

295.   Defendant Martinez, however, was insistent that Plaintiff complete the work. Defendant Martinez did not help Plaintiff or train her during this time period and he did not work past the end of the school day.

296.   Krystal Smith was aware that Plaintiff was completing work off the clock after school hours from home because Plaintiff often used her as a resource when Plaintiff was unsure of how to do certain transcripts.

297.   On August 8, 2017, Defendant Martinez asked Plaintiff to finish tasks for the upcoming graduation after work hours. When Plaintiff asked him about clocking in for the hours, he stated that Plaintiff could not clock in because Ms. Doyle would be upset about overtime and that Plaintiff could get in trouble.

298.   Plaintiff informed Krystal Smith about this conversation after speaking with Defendant Martinez.

299.   On August 27, 2017, after Plaintiff turned in her hours for payroll, Defendant Martinez confronted Plaintiff and asked that Plaintiff not count all of the hours she worked because Ms. Doyle would be unhappy about the amount of overtime.

300.   Krystal Smith was aware that Defendant Martinez was upset about the excess overtime because she overheard Plaintiff and Defendant Martinez speak after the education meeting.

301.   On August 22, 2017, Plaintiff informed Ms. Sampson of the overtime issue and explained that Plaintiff could not complete Plaintiff and Defendant Martinez's duties during an eight-hour workday.

302.   Ms. Sampson stated that she needed Plaintiff to complete the work because Defendant Martinez had not done so and that she would ensure that Plaintiff received a $500 bonus. Plaintiff never received the bonus and was never paid for the overtime.

303.   On August 24, 2017, Defendant Martinez asked that Plaintiff cover his position in the weekly Clinical Meeting because he had to meet with a new hire.

304.   Plaintiff covered the Clinical Meeting.

305.    Plaintiff later learned that Defendant Martinez was offsite and the new hire met with other staff.

306.    Plaintiff began covering the Clinical Meetings almost weekly at this point in time.

307.    The meeting reports with Plaintiff's attendance are with Defendant Rite of Passage.

308.    The Clinical Meeting was during Plaintiff's lunch hour. Plaintiff began counting the hour on her timesheet because the others in the meeting were getting paid to be there.

309.    During November 2017, Ms. Doyle telephoned Plaintiff and stated that Plaintiff had to clock out for lunch despite working during that time.

310.    During February 2018, it was brought to Ms. Doyle's attention that Plaintiff had been filling in as a substitute from July 2017 – November 2017.

311.    Shawnetta Madden, Steven Terry and Krystal Smith confirmed that Plaintiff had been a long-term substitute teacher.

312.    Ms. Doyle stated that had she been aware that Plaintiff was substitute teaching for that period of time, Plaintiff would have had a job title change and change in pay to compensate for the work.

313.    Ms. Doyle stated that it was Defendant Martinez's duty to substitute teach, not Plaintiff's.

314.    Ms. Doyle stated that she would research how to back pay Plaintiff for that work, but Plaintiff was never compensated for those hours.

315.    Ms. Doyle later stated that Plaintiff could not prove that she taught during that time and Plaintiff could not be compensated.

316.    In approximately April 2018, following Shawnetta Madden's removal from BKMYSC, Mr. Wood took over the facility as Program Director. Ms. West and Mr. Terry made Mr. Wood aware that Plaintiff had been working off the clock throughout Plaintiff's

employment to complete the necessary tasks for the Education Department and Plaintiff had been asked to do so by Defendant Martinez and Ms. Sampson.

317.     Ms. West and Mr. Terry made Mr. Wood aware that Plaintiff had been in trouble with Ms. Doyle in the past for excessive overtime, and the Plaintiff was scared to count all of her hours because of Defendant Martinez and Ms. Sampson.

318.     Mr. Wood was very upset that Plaintiff had been working off the clock and informed Plaintiff that she needed to be clocked in for all of her working hours and paid for her work. Mr. Wood consistently checked in following that to ensure Plaintiff was clocking in appropriately.

319.     Despite Mr. Wood being adamant that Plaintiff be paid for all hours worked, Plaintiff still had issues with Ms. Doyle regarding excess overtime hours.

320.     Because Defendant Martinez had resigned and no one was hired to fill his position for approximately three (3) months, Plaintiff was completing all administrative duties for the Education Department, which required excess overtime. This was common knowledge of all management.

321.     Ms. Doyle contacted Mr. Terry about Plaintiff's excess overtime instructing that Plaintiff's hours needed to be cut and Plaintiff should not exceed forty (40) hours per week.

322.     Mr. Terry explained to Ms. Doyle that Plaintiff was completing necessary work during those hours.

323.     Ms. Doyle remained adamant that Plaintiff not exceed forty (40) hours per week.

324.     As Assistant Program Direct and Clinical Director, Mr. Terry and Ms. West were both aware that Plaintiff worked excess overtime to complete necessary duties and that Ms.

Doyle and Defendant Martinez were both harsh towards Plaintiff when she clocked in for overtime.

325.   Mr. Terry and Ms. West were aware that Ms. Sampson knew that Plaintiff worked unpaid hours and completed duties that Ms. Sampson required Plaintiff to complete uncompensated.

326.   The teachers within the Education Department were also aware of the excess hours Plaintiff worked. The teachers witnessed Defendant Martinez questioning Plaintiff's hours and stating that were issues with Human Resources in reference to Plaintiff's work hours.

327.   Plaintiff worked overtime nearly every day of her Monday – Friday schedule. Plaintiff worked anywhere between two to four (2-4) hours of overtime per day. Plaintiff also worked many Saturdays in order to complete work or proctor GED examinations. Plaintiff worked anywhere between two to six (2-6) hours to proctor GED examinations depending on test times and the number of students.

328.   Danielle Alvaro and Charles Allen, Shift Supervisors, can confirm that Plaintiff worked after school hours and weekends. Ms. Alvaro can confirm that Plaintiff was expected to work off the clock due to her position in the facility and conversations with Mr. Terry.

329.   It was known within BKMYSC that accumulating overtime was a major issue with Human Resources and that Ms. Doyle would often have outbursts when staff worked excess overtime.

330.   Despite the serious staff shortage at BKMYSC, it was expected by Ms. Doyle that staff not have overtime but complete the work.

331. Mr. Terry met with Ms. Doyle about the overtime issue, and Ms. Doyle stated that although staff may be working during their lunch breaks or after hours, that Human Resources would not tolerate the excess hours. Instead, staff was expected to clock out.

332. Ms. West had several conversations with Plaintiff in reference to the excess unpaid hours Plaintiff worked. Ms. West told Plaintiff that Human Resources would not pay Plaintiff for the excess time and work.

333. Plaintiff's position could not allow the work to go undone because the students would suffer as a result. In addition, it was also expected by Defendant Rite of Passage that the school remain in good standing and that could only be accomplished if Plaintiff worked the extra time to complete the work.  This was all known to Defendant Rite of Passage.

### COUNT I: SEX DISCRIMINATION/SEXUAL HARASSMENT AGAINST DEFENDANT RITE OF PASSAGE 42 U.S.C. § 2000e *et seq.*

334. Plaintiff reincorporates, as if fully realleged herein, the foregoing paragraphs of the Complaint.

335. Plaintiff is a member of a protected class because she is female.

336. Plaintiff was subjected to continual unwelcomed sexual harassment, including but not limited to, when Defendant Martinez daily asked Plaintiff out on dates and when Defendant Martinez sexually assaulted Plaintiff.

337. The unwelcomed sexual harassment and sexual assault was because of Plaintiff's sex.

338. The sexual harassment unreasonably interfered with Plaintiff's work performance and created a hostile work environment.

339. Defendant Rite of Passage failed to take appropriate action as evidenced by, among other actions, the fact that it did not terminate Defendant Martinez, had Defendant Martinez

continue to act as her supervisor and had Defendant Martinez give Plaintiff her performance evaluation.

340.    Defendant Rite of Passage discriminated against Plaintiff because of her sex in violation of 42 U.S.C. § 2000e-2(a)(1).

<u>**COUNT II: RETALIATION FOR COMPLAINTS OF**</u>
<u>**SEX DISCRIMINATION/SEXUAL HARASSMENT**</u>
<u>**AGAINST DEFENDANT RITE OF PASSAGE**</u>
<u>**42 U.S.C. § 2000e-3(a)**</u>

341.    Plaintiff reincorporates, as if fully realleged herein, the foregoing paragraphs of the Complaint.

342.    Plaintiff engaged in protected activity when she internally complained about Defendant Martinez's sexual harassment and sexual assault and filed a Charge of Discrimination.

343.    Defendant Rite of Passage's management had knowledge of Plaintiff's complaints of sexual harassment and sexual assault.

344.    Defendant Rite of Passage took an adverse action against Plaintiff, including but not limited to, when it failed to promote her, failed to give her a promised bonus, gave her a performance review that negatively impacted her merit pay increase, demoted Plaintiff to a position that paid $4.00 an hour less.

345.    There is a causal connection between Plaintiff's complaints of sexual harassment and sexual assault and the adverse actions as evidenced by, among other actions, the temporal proximity between the protected activity and the adverse employment actions.

346.    Defendant Rite of Passage retaliated against Plaintiff in violation of 42 U.S.C. § 2000e-3(a).

### COUNT III: MINIMUM WAGE PROVISION, FAIR LABOR STANDARDS ACT
### AGAINST DEFENDANT RITE OF PASSAGE
### 29 U.S.C. § 206

347.   Plaintiff reincorporates, as if fully realleged herein, the foregoing paragraphs of the Complaint.

348.   Plaintiff was an "employee" as that term is defined by the FLSA, 29 U.S.C. § 203(e).

349.   Defendant Rite of Passage "employed" Plaintiff as that term is defined by the FLSA, 29 U.S.C. § 203(g).

350.   Defendant Rite of Passage was Plaintiff's "employer" as that term is defined by the FLSA, 29 U.S.C. § 203(d).

351.   Plaintiff performed at least two to four hours of work during the workweek and up to six hours a day on some Saturdays for which she was not paid any income during her employment with Defendant Rite of Passage.  All additional and overtime work was for the benefit of Rite of Passage.

352.   Defendant Rite of Passage had knowledge of Plaintiff's additional and overtime hours.

353.   Defendant Rite of Passage violated 29 U.S.C. § 206.

### COUNT IV: OVERTIME PROVISION, FAIR LABOR STANDARDS ACT
### AGAINST DEFENDANT RITE OF PASSAGE
### 29 U.S.C. § 207(a)

354.   Plaintiff reincorporates, as if fully realleged herein, the foregoing paragraphs of the Complaint.

355.   Plaintiff was an "employee" as that term is defined by the FLSA, 29 U.S.C. § 203(e).

356.   Defendant Rite of Passage "employed" Plaintiff as that term is defined by the FLSA, 29 U.S.C. § 203(g).

357.   Defendant Rite of Passage was Plaintiff's "employer" as that term is defined by the FLSA, 29 U.S.C. § 203(d).

358.   Plaintiff performed at least two to four hours of work during the workweek and up to six hours a day on some Saturdays for which she was not paid any income during her employment with Defendant Rite of Passage.  All additional and overtime work was for the benefit of Rite of Passage.

359.   Defendant Rite of Passage had knowledge of Plaintiff's additional and overtime hours.

360.   Defendant Rite of Passage violated 29 U.S.C. § 207(a).

## COUNT V: SEX DISCRIMINATION/SEXUAL HARASSMENT AGAINST DEFENDANTS RITE OF PASSAGE C.R.S. 24-34-301, *et seq.*

361.   Plaintiff reincorporates, as if fully realleged herein, the foregoing paragraphs of the Complaint.

362.   Plaintiff is a member of a protected class because she is female.

363.   Plaintiff was subjected to unwelcomed sexual harassment, including but not limited to, when Defendant Martinez daily asked Plaintiff out on dates and when Defendant Martinez sexually assaulted Plaintiff.

364.   The unwelcomed sexual harassment and sexual assault was because of Plaintiff's sex.

365.   The sexual harassment unreasonably interfered with Plaintiff's work performance and created a hostile work environment.

366.   Defendant Rite of Passage failed to take appropriate action as evidenced by, among other actions, the fact that it did not terminate Defendant Martinez, had Defendant Martinez continue to act as her supervisor and had Defendant Martinez give Plaintiff her performance evaluation.

367.    Defendant Rite of Passage discriminated against Plaintiff because of her sex in violation of C.R.S. 24-34-402(1)(a).

**COUNT VI: AIDED/ABETTED SEX DISCRIMINATION/SEXUAL HARASSMENT
AGAINST DEFENDANT MARTINEZ
C.R.S. 24-34-402(1)(e)(I)**

368.    Plaintiff reincorporates, as if fully realleged herein, the foregoing paragraphs of the Complaint.

369.    Plaintiff is a member of a protected class because she is female.

370.    Plaintiff was subjected to unwelcomed sexual harassment when Defendant Martinez daily asked Plaintiff out on dates and when Defendant Martinez sexually assaulted Plaintiff.

371.    The unwelcomed sexual harassment and sexual assault was because of Plaintiff's sex.

372.    The sexual harassment unreasonably interfered with Plaintiff's work performance and created a hostile work environment.

373.    Defendant Rite of Passage failed to take appropriate action as evidenced by, among other actions, the fact that it did not terminate Defendant Martinez, had Defendant Martinez continue to act as her supervisor and had Defendant Martinez give Plaintiff her performance evaluation.

374.    Defendant Martinez aided, abetted, incited, compelled or coerced an unlawful discriminatory practice and/or attempted directly or indirectly to commit an unlawful discriminatory practice in violation of C.R.S. 24-34-402(1)(e)(I).

**COUNT VII: RETALIATION FOR COMPLAINTS OF
SEX DISCRIMINATION/SEXUAL HARASSMENT
AGAINST DEFENDANT RITE OF PASSAGE
C.R.S. 24-34-402(1)(e)(IV)**

375.    Plaintiff reincorporates, as if fully realleged herein, the foregoing paragraphs of the Complaint.

376. Plaintiff engaged in protected activity when she internally complained about Defendant Martinez's sexual harassment and sexual assault and filed a Charge of Discrimination.

377. Defendant Rite of Passage's management had knowledge of Plaintiff's complaints of sexual harassment and sexual assault.

378. Defendant Rite of Passage took an adverse action against Plaintiff, including but not limited to, when it failed to promote her, failed to give her a promised bonus, gave her a performance review that negatively impacted her merit pay increase, and demoting Plaintiff to a position that paid $4.00 less an hour.

379. There is a causal connection between Plaintiff's complaints of sexual harassment and sexual assault and the adverse actions as evidenced by, among other actions, the temporal proximity between the protected activity and the adverse employment actions.

380. Defendants Rite of Passage retaliated against Plaintiff in violation of C.R.S. 24-34-402(1)(e)(IV).

**COUNT VIII: AIDED/ABETTED RETALIATION FOR COMPLAINTS OF SEX DISCRIMINATION/SEXUAL HARASSMENT AGAINST DEFENDANT MARTINEZ C.R.S. 24-34-402(1)(e)(I)**

381. Plaintiff reincorporates, as if fully realleged herein, the foregoing paragraphs of the Complaint.

382. Plaintiff engaged in protected activity when she internally complained about Defendant Martinez's sexual harassment and sexual assault and filed a Charge of Discrimination.

383. Defendant Rite of Passage's management had knowledge of Plaintiff's complaints of sexual harassment and sexual assault.

384. Defendant Rite of Passage took an adverse action against Plaintiff, including but not limited to, when it failed to promote her, failed to give her a promised bonus, gave her a

performance review that negatively impacted her merit pay increase, and demoted Plaintiff to a position that paid $4.00 less an hour.

385.    There is a causal connection between Plaintiff's complaints of sexual harassment and sexual assault and the adverse actions as evidenced by, among other actions, the temporal proximity between the protected activity and the adverse employment actions.

386.    Defendant Martinez aided, abetted, incited, compelled or coerced an unlawful retaliatory practice and/or attempted directly or indirectly to commit an unlawful retaliatory practice in violation of C.R.S. 24-34-402(1)(e)(I).

**COUNT IX: COLORADO MINIMUM WAGE ACT
AGAINST DEFENDANT RITE OF PASSAGE
FOR MINIMUM WAGE AND OVERTIME
C.R.S. §§ 8-6-101 _et seq._
as Implemented by the MWO, 7 C.C.R. 1103-1**

387.    Plaintiff reincorporates, as if fully realleged herein, the foregoing paragraphs of the Complaint.

388.    Defendant Rite of Passage was Plaintiff's "employer" as that term is defined by the MWO because it employed Plaintiff in Colorado, 7 C.C.R. 1103-1(2).

389.    Plaintiff was Defendant Rite of Passage "employee" as that term is defined by the MWO because she performed labor for the benefit of Defendant Rite of Passage in which Defendant Rite of Passage commanded when, where and how much labor or services would be performed, 7 C.C.R. 1103-1(2).

390.    Plaintiff performed at least two to four hours of work during the workweek and up to six hours a day on some Saturdays for which she was not paid any income during her employment with Defendant Rite of Passage.  All additional and overtime work was for the benefit of Rite of Passage.

391.   Defendant Rite of Passage had knowledge of Plaintiff's additional and overtime hours.

392.   Defendant Rite of Passage violated C.R.S. § 8-6-118 and 7 C.C.R. 1103-1(18).

   **WHEREFORE,** Plaintiff Katherine Smith prays for judgment in her favor, back pay, front

pay or reinstatement, punitive damages, pain and suffering, compensatory and non-economic

damages in an amount exceeding $75,000, attorneys' fees, costs, pre- and post-judgment interest,

and any other relief to which she may be entitled.


                         Respectfully submitted,

                         /s/ *Randolph H. Freking*
                         Randolph H. Freking (Colo. Reg. No. 40871)
                         FREKING MYERS & REUL LLC
                         999 18th Street, Suite 3000
                         Denver, CO 80202
                         Tel.: (303) 357-2355
                         *randy@fmr.law*

                         Laren E. Knoll (Ohio Reg. No. 0070594)
                         *Pro Hac Vice to be filed*
                         The Knoll Law Firm LLC
                         7240 Muirfield Dr., Suite 120
                         Dublin, Ohio 43017
                         Tel.: (614) 372-8890
                         Facsimile: (614) 452-4850


                         *Counsel for Plaintiff Katherine Smith*


## JURY DEMAND

Plaintiff requests a trial by a jury an all issues set forth herein.

                         /s/ *Randolph H. Freking*
                         Randolph H. Freking (Colo. Reg. No. 40871)